855 A.2d 726

**COMMONWEALTH of Pennsylvania, Appellee**

v.

**Robert BRYANT, Appellant.**

Supreme Court of Pennsylvania.

Submitted Oct. 28, 2002.

Decided Aug. 18, 2004.

Reargument Denied Oct. 14, 2004.

124

Robert Brett Dunham, for Robert Bryant.

Michael Wayne Streily, Rebecca Denean Spangler, Amy Zapp, Pittsburgh, for Com.

Before CAPPY, C.J., CASTILLE, NIGRO, NEWMAN, SAYLOR, EAKIN & BAER, JJ.

## OPINION

Justice CASTILLE.

This is an appeal from the partial denial of appellant's petition for relief under the Post Conviction Relief Act ("PCRA"), 42 Pa.C.S. § 9541 *et seq.* The PCRA court vacated

appellant's death sentence and ordered a new sentencing hearing, but denied appellant's other claims for relief. For the reasons set forth below, we find that appellant is not entitled to further relief and, accordingly, affirm the order of the PCRA court.

In November 1983, prison authorities at the State Correctional Institution at Pittsburgh, acting upon information provided by an inmate, Abe Chapman, found appellant, also an inmate, to be in possession of marijuana. Prison authorities placed appellant in the prison's Restrictive Housing Unit (RHU) for a period of 120 days. When appellant was released from the RHU, he stated to the correctional officer who had found the marijuana that he knew it was Chapman who had "snitched" on him and that he would "take care of it." N.T. 3/27/87, at 200. The same correctional officer later testified that appellant made retaliatory remarks against Chapman on at least three other occasions, stating at one point that "every dog will have his day." *Id.*

On the morning of May 15, 1984, appellant and another inmate, Larry Greer, entered Chapman's cell and killed him. Greer, who weighed between 195 and 200 pounds, held the 130–pound Chapman on his bed while appellant used an eight-inch long homemade knife to stab his victim fifteen times in the chest, back, face and leg. In the frenzy of the attack, appellant also inflicted errant stab wounds upon himself and Greer. Blood that was consistent with Greer's blood-type was splattered on a pair of Chapman's trousers hanging in the cell, and on the sleeve of the jacket worn by appellant at the time.

Joseph Hill, an inmate housed in the same cellblock as Chapman, observed Greer and appellant running toward him as he left his cell for breakfast. Hill noticed blood dripping from Greer's arm. As appellant reached Hill's location, he thrust the knife he was carrying into Hill's hand and told him to get rid of it. Hill placed the knife in a bag, which he disposed of in a trash can on his way to breakfast. A correctional officer who observed Hill placing the bag in the can later testified that he thought it odd that Hill did not just

toss the package in the can, but rather, "placed" it there. N.T. 3/26/87, at 170.

Greer ultimately fled to the shower area where prison authorities later found blood consistent with his blood-type. Appellant, meanwhile, had returned to his cell and was seated on a stool with a handkerchief wrapped around his hand when another inmate, Joseph Ezzo, stopped to inquire whether appellant was going to his prison job that morning. According to Ezzo's testimony, appellant answered that he was not, and further volunteered that he had just killed Chapman. At that point, prison authorities had been alerted to Chapman's murder and had ordered inmates back into their cells. Moments later, Ezzo informed a correctional officer that appellant had admitted to the killing. The correctional officer then went to appellant's cell and observed a one-inch gash on the palm of appellant's hand.

On April 16, 1986, after a trial before the Honorable James R. MacGregor, a jury found appellant guilty of murder in the first degree and returned a sentence of death. On post-verdict motions, however, the trial court granted a new trial, finding that a potentially prejudicial police report had been improperly included with other exhibits for the jury to consider during deliberations.

At a second trial in March 1987, before the Honorable John W. O'Brien, a jury found appellant guilty of first degree murder. At his insistence, appellant represented himself during substantial portions of the trial. Eventually, however, he agreed to permit appointed stand-by counsel, Alonzo Burney, Esquire, to take over. Following a penalty hearing, at which trial counsel did not present mitigating evidence, the jury returned a sentence of death on March 31, 1987.[1] This Court affirmed the judgment of sentence on May 10, 1990. *Commonwealth v. Bryant*, 524 Pa. 564, 574 A.2d 590 (1990). Mr. Burney represented appellant on that appeal.

1. The jury found one aggravating circumstance: murder by a life prisoner, 42. Pa.C.S. § 9711(d)(10), and no mitigating circumstances.

On June 3, 1996, appellant filed a *pro se* PCRA petition. Appellant requested that the then Pennsylvania Post–Conviction Defender Association[2] be permitted to represent him as post-conviction counsel and the PCRA court, per Judge O'Brien, granted appellant's request.

On May 22, 1997, appointed counsel filed an amended petition for habeas corpus and PCRA relief raising seventeen claims of trial court error, prosecutorial misconduct and trial counsel ineffectiveness. The Commonwealth filed a timely answer. The Commonwealth alleged, *inter alia,* that it was prejudiced in responding to appellant's specific claim that trial counsel was ineffective for failing to present mitigation evidence at the penalty phase—noting the nine years that had passed since appellant's conviction—and requested a hearing limited to that issue. Judge O'Brien ordered a hearing to consider the Commonwealth's claim that it was prejudiced. Judge O'Brien also issued a Notice of Intent to Dismiss without a hearing regarding appellant's remaining claims. Appellant's counsel requested the expansion of the evidentiary hearing to include expert and lay testimony on the "deplorable conditions on death row in Pennsylvania" and appellant's alleged borderline mental retardation and other psychological impairments. The request was denied.

At a February 27, 1998 hearing on the limited grounds sought by the Commonwealth, trial counsel testified that he could not recall whether he investigated possible mitigation evidence for the penalty phase. On the basis of trial counsel's testimony, Judge O'Brien vacated the sentence of death and ordered a new sentencing hearing. Appellant's guilt phase claims were dismissed. In a brief two-page opinion filed on May 15, 1998, Judge O'Brien failed to address the guilt phase claims individually, instead adverting to the Commonwealth's answer, and then noting, without referring to any particular claim, that "[t]he Court denied petitioner relief for the reasons that his claims were alternatively insufficiently pled, were without merit, had been previously litigated or were not

---

**2.** Appellant is now represented by the Capital Habeas Unit of the Defender Association of Philadelphia.

preserved at a time when the petitioner acted as his own counsel." PCRA slip. op. at 2.

Appellant appealed the dismissal of his claims for guilt-phase relief to the Superior Court. The Commonwealth did not appeal the grant of penalty phase relief. On June 10, 1998, the Honorable Gerard M. Bigley of the Court of Common Pleas of Allegheny County granted the Commonwealth's request for a Stay or Supersedeas of the penalty phase retrial pending the outcome of appellant's appeal. The next day, the Superior Court quashed appellant's appeal without prejudice, noting that it was "constrained to remand this matter to the trial court with the directive that the trial court conduct a sentencing hearing and impose a judgment of sentence upon appellant." Slip. op at 4. The panel further noted that, in the event the trial court should impose a sentence of death upon appellant for a third time, this Court, rather than the Superior Court, would have jurisdiction over the appeal.

On September 26, 2001, this Court vacated the Superior Court's order pursuant to Pa.R.A.P. 751, and directed the Superior Court to transfer appellant's appeal to this Court. *See* 29 WAP 2000. The appeal was so transferred on January 7, 2002.

On February 6, 2003, this Court remanded the matter to the PCRA court for preparation of an adequate opinion reflecting its independent consideration of the issues raised in the amended PCRA petition in accordance with *Commonwealth v. (Craig) Williams,* 566 Pa.553, 782 A.2d 517 (2001), and *Commonwealth v.(Roy) Williams,* 557 Pa.207, 732 A.2d 1167 (1999). Thereafter, the PCRA court, now acting per the Honorable Lawrence J. O'Toole,[3] filed an opinion addressing appellant's claims.

Appellant's brief in this Court raises the following thirteen claims, which are essentially the same as the claims raised in his amended PCRA petition:

1. Whether appellant is entitled to review of the merits of all of the issues raised because prior counsel was ineffective

---

3. The original PCRA judge, Judge O'Brien, is no longer on the bench.

for failing to properly preserve and litigate each of the issues raised in this appeal?

2. Whether appellant was denied his state and federal constitutional rights to due process where the jury heard evidence of appellant's prior criminal acts but the trial court failed to give the jury a cautionary instruction mitigating the prejudicial effects of that evidence, and was counsel ineffective for failing to seek to preclude such evidence or request an appropriate charge?

3. Whether appellant's state and federal constitutional protections against self incrimination, to due process and to effective assistance of counsel were violated when the Commonwealth introduced evidence during its case in chief that, during police interrogation, appellant exercised his constitutional right to remain silent?

4. Whether the trial court's failure to instruct the jury on the defense of alibi deprived appellant of his state and federal constitutional rights to due process and whether counsel's failures to request an appropriate instruction, object to its omission, and raise the claim on appeal denied appellant the effective assistance of counsel?

5. Whether appellant was constructively denied his constitutional rights to counsel as well as his rights to effective assistance of counsel where trial counsel's closing argument failed to articulate appellant's theory of the case, consisted of barely coherent statements, and essentially conceded appellant's guilt?

6. Whether appellant was denied the effective assistance of counsel where counsel failed to consult with and present forensic experts who could have refuted the Commonwealth's theory of the crime?

7. Whether appellant was denied the effective assistance of counsel where counsel failed to challenge the credibility of a crucial Commonwealth witness with evidence of a glove seized from that witness and failed to present the testimony of numerous witnesses whose testimony would have seriously undermined the testimony of the Commonwealth witness?

8. Whether appellant was denied his state and federal constitutional rights to due process when the prosecutor repeatedly sought to bolster the credibility of his witnesses through the use of inadmissible evidence and impermissible comments?

9. Whether the trial court erred in denying appellant his state and federal constitutional rights to due process, when it instructed the jury that they could not consider any lesser offense unless they unanimously concluded that appellant was not guilty of the greater offense?

10. Whether appellant was denied the effective assistance of appellate counsel where counsel neither obtained nor reviewed the complete record?

11. Whether appellant was denied his state and federal constitutional rights to due process, the effective assistance of counsel, and to a full and fair PCRA hearing where significant portions of the record have either never been produced or have not been provided to PCRA counsel, where the PCRA court failed to order necessary discovery, and where the PCRA court refused to grant an evidentiary hearing?

12. Whether prior counsel was ineffective for failing to raise the issues presented in the PCRA petition at trial and in post-trial motions and for failing to litigate these issues on appeal?

13. Whether appellant is entitled to relief from his conviction because of the cumulative effect of these errors?

To be eligible for relief under the PCRA, an appellant must prove, among other things, that the issues he raises have not been previously litigated or waived. 42 Pa.C.S. § 9543(a)(3) (as amended effective January 16, 1996). Appellant's claims *sub judice* are waived to the extent they allege trial court error or prosecutorial misconduct since such claims could have been raised on direct appeal (*see* issues two, three, four, eight and nine). 42 Pa.C.S. § 9544(b). *See Commonwealth v. Bracey,* 568 Pa. 264, 795 A.2d 935, 940 (2001) ("If the allegations of error have not been previously litigated, a

petitioner must also demonstrate that those allegations have not been waived. An allegation is deemed waived 'if the petitioner could have raised it but failed to do so before trial, at trial, during unitary review, [or] on appeal . . . .' ") (quoting statute). Several of the waived issues, however, include boilerplate, tag-line ineffectiveness claims (*see* issues two, three and four). Also, appellant's redundant first and twelfth issues include global, boilerplate allegations that trial/direct appeal counsel was ineffective for failing to raise all of the substantive claims alleged in his brief—even though claim eleven raises PCRA court error and has nothing to do with his prior counsel. Finally, issues five, six, seven and ten purport to assert claims which sound only in the ineffective assistance of counsel. Since the PCRA proceeding constituted appellant's first opportunity to challenge the stewardship of trial/direct appeal counsel, appellant's claims of counsel ineffectiveness are cognizable, 42 Pa.C.S. § 9543(a)(2)(ii), and not waived. Accordingly, we will review issues two through ten to the extent they sound in trial counsel's alleged ineffectiveness. We will also review the remaining substantive claim (claim eleven), which alleges PCRA court error.

█ Appellant claims that trial counsel's ineffectiveness deprived him of his right to counsel under both the federal Constitution and the Pennsylvania Constitution. The test for counsel ineffectiveness under the two charters is coterminous: it is the performance and prejudice paradigm set forth by the U.S. Supreme Court in its seminal decision in *Strickland v. Washington*, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984). *See, e.g., Commonwealth v. Bomar*, 573 Pa. 426, 826 A.2d 831, 855 (2003); *Commonwealth v. Bond*, 572 Pa. 588, 819 A.2d 33, 41–42 (2002); *Commonwealth v. Busanet*, 572 Pa. 535, 817 A.2d 1060, 1066 (2002); *Commonwealth v. Williams*, 566 Pa. 553, 782 A.2d 517, 524 (2001). *Accord Rompilla v. Horn*, 355 F.3d 233, 246–50 (3d Cir.2004); *Werts v. Vaughn*, 228 F.3d 178, 203 (3d Cir.2000), *cert. denied*, 532 U.S. 980, 121 S.Ct. 1621, 149 L.Ed.2d 483 (2001).

To better focus the *Strickland* analysis, this Court has applied the performance half of the test by looking both to the arguable merit of the claim lodged against counsel as well as the objective reasonableness of the path taken, or not taken, by counsel. *E.g., Bomar,* 826 A.2d at 855 n. 19. Thus, the constitutional ineffectiveness standard requires the defendant to rebut the presumption of professional competence by demonstrating that: (1) his underlying claim is of arguable merit; (2) the particular course of conduct pursued by counsel did not have some reasonable basis designed to effectuate his interests; and (3) but for counsel's ineffectiveness, there is a reasonable probability that the outcome of the proceedings would have been different. *Commonwealth v. (Michael) Pierce,* 567 Pa.186, 786 A.2d 203, 213 (2001); *Commonwealth v. Kimball,* 555 Pa. 299, 724 A.2d 326, 333 (1999). A failure to satisfy any prong of the test for ineffectiveness will require rejection of the claim. *(Michael) Pierce,* 567 Pa. 186, 786 A.2d 203.[4]

Review of appellant's claims is complicated by the fact that he waived his right to counsel and represented himself during substantial portions of his trial. The PCRA court concluded that "to now ignore the issue of waiver [of the issues that appellant himself failed to raise at trial] would allow [appellant] to make a mockery of the judicial process and guarantee immunity from the consequences of self-representation." PCRA court slip op. at 8. We share this concern.

A criminal defendant who knowingly and intelligently waives his right to counsel so that he may represent himself at trial may not later rely upon his own lack of legal expertise as a ground for a new trial. *See Faretta v. California,* 422 U.S. 806, 834 n. 46, 95 S.Ct. 2525, 45 L.Ed.2d 562 (1975) ("[A] defendant who elects to represent himself cannot thereafter complain that the quality of his own defense amounted to a

---

4. This Court's approach to "layered" claims of ineffectiveness, as set forth in *Commonwealth v. Rush,* 576 Pa. 3, 838 A.2d 651 (2003), and *Commonwealth v. McGill,* 574 Pa. 574, 832 A.2d 1014 (2003), is not implicated here because appellant was not represented by new counsel on direct appeal.

denial of 'effective assistance of counsel.' "); *Commonwealth v. Griffin,* 537 Pa. 447, 644 A.2d 1167, 1171 (1994); *Commonwealth v. Szuchon,* 506 Pa. 228, 484 A.2d 1365, 1377 (1984) ("To hold otherwise would create a situation wherein a defendant, by design, could build into his case ineffective assistance of counsel claims, thus guaranteeing himself a basis for a new trial if the verdict were adverse to him."). Mr. Burney represented appellant throughout most of the pre-trial proceedings, but once the trial court had disposed of all pre-trial motions and jury selection was complete, appellant invoked his constitutional right to self-representation. *See Faretta,* 422 U.S. at 836, 95 S.Ct. 2525 (defendant has Sixth Amendment right to conduct his own defense). In a thorough colloquy to determine whether appellant's waiver was knowing and intelligent, the trial court instructed appellant on the nature of the charges against him, the possible consequences of his decision, and the responsibilities that he would assume as his own counsel, including the following:

> Now, I guess the other thing is that when somebody assumes the responsibility of defending themselves [sic] and they're not legally trained, they are bound by the same restrictions or they are held to the same level of knowledge as a person who is trained in the law which means that you have to abide by the rules of court, the Rules of Criminal Procedure; very importantly, the Rules of Evidence ... and this again I have to point out is an area in which you are unskilled and there may be other ways of getting at it; and that's where you would be at a disadvantage....

N.T. 3/25/87 at 62–63. After appellant repeatedly stated that he understood the significance of his waiver decision, the trial court invited the prosecutor to supplement the colloquy. Accordingly, the prosecutor asked appellant, *inter alia,* whether he also understood that he would be unable to claim ineffective assistance of counsel on appeal. Appellant stated that he understood this consequence as well. Having thus waived his right to counsel, appellant proceeded to represent himself through most of the Commonwealth's presentation of

its evidence with Mr. Burney serving as stand-by counsel.[5] However, when an alleged dental problem rendered appellant unable (or unwilling) to continue as his own counsel, Mr. Burney resumed primary representation. The only Commonwealth witness who had not testified when Mr. Burney resumed representation was State Trooper William McAtee, an expert witness who testified regarding blood evidence. Because appellant waived his right to counsel and asserted his right to self-representation, which was honored after a colloquy, he may not rely upon his own lack of expertise as a ground for relief, and consequently, we will not consider any ineffectiveness claims that arise from the period of self-representation. *See Faretta*, 422 U.S. at 834 n. 46, 95 S.Ct. 2525; *Szuchon*, 484 A.2d at 1377.

■ The Commonwealth goes further, however, and argues that appellant is precluded from raising *any* trial counsel ineffectiveness claims because, once appellant waived his right to counsel, he waived the right for the remainder of trial. We will not go this far.

■ "It is well established that a defendant can waive the right of self-representation after asserting it." *Buhl v. Cooksey*, 233 F.3d 783, 800 (3d Cir.2000) (citing cases); *see also Wilson v. Walker*, 204 F.3d 33, 38 (2d Cir.2000) (petitioner abandoned initial request where he subsequently had two different lawyers appointed and did not assert right again after question of self-representation had been left open for further discussion); *Williams v. Bartlett*, 44 F.3d 95, 100 (2d Cir.1994) ("Once asserted ... the right to self-representation may be waived through conduct indicating that one is vacillating on the issue or has abandoned one's request altogether.") *Raulerson v. Wainwright*, 732 F.2d 803, 809 (11th Cir.) (defendant waived self-representation right by proceeding with as-

5. *See Commonwealth v. Davis*, 479 Pa. 274, 388 A.2d 324, 325 n. 3 (1978) (it is strongly advisable, especially in potential death penalty case, that trial judge appoint "stand-by" counsel to assist defendant to whatever extent defendant permits); *see also McKaskle v. Wiggins*, 465 U.S. 168, 104 S.Ct. 944, 79 L.Ed.2d 122 (1984) (appropriate for judge to appoint "stand-by counsel" to "steer defendant through the basic procedures of the trial.").

signed counsel), *cert. denied,* 469 U.S. 966, 105 S.Ct. 366, 83 L.Ed.2d 302 (1984). Here, when appellant announced that he was experiencing dental pain and was unable to continue with self-representation, the trial court ordered a recess for a dental examination. Despite two dentists' conclusions to the contrary, appellant insisted that he was unable to speak. In the following colloquy with appellant and Mr. Burney, appellant affirmed that he wanted Mr. Burney to serve as his counsel again:

THE COURT: ... I suggested that if you still felt that you were unable to carry on, that maybe we could, if you were agreeable, let you turn the case over to Mr. Burney and let him carry on with the case from this point on and the District Attorney had agreed that because of the unusual circumstances of this case, that he would agree to do that....

MR BURNEY: Are you willing at this particular point to have myself now act as your trial counsel because of the medical problems you're having; is that not correct.

MR. BRYANT: Yes.

THE COURT: All right. You said yes; is that correct?

MR. BRYANT: Yes....

THE COURT: Well, okay then. Well, at any rate, you are agreeable to Mr. Burney taking over at this point?

MR. BRYANT: Yes.

N.T. 3/27/87 at 293–95.

A court should indulge every reasonable presumption against the waiver of counsel. *See Commonwealth ex rel. McCray v. Rundle,* 415 Pa. 65, 202 A.2d 303, 305 (1964). *Accord Johnson v. Zerbst,* 304 U.S. 458, 464, 58 S.Ct. 1019, 82 L.Ed. 1461 (1938). Although the trial court expressed some skepticism regarding appellant's professed inability to continue as his own counsel, he was apparently satisfied that appellant was not acting in bad faith, and that he wished to proceed with counsel. Accordingly, the trial court expressly permitted appellant to continue with counsel, notwithstanding appellant's earlier waiver of the right. *See Stano v. Dugger,* 921 F.2d

1125, 1143 (11th Cir.1991) (*en banc*) (although right to counsel "attaches automatically and must be waived affirmatively to be lost," right to self-representation does not "attach unless and until it is asserted"). Of course, appellant's mid-trial change of mind created circumstances which, as a practical matter, may make it difficult for him to prevail upon certain claims of ineffectiveness. Nevertheless, we reject the Commonwealth's submission that appellant was not entitled to effective counsel once Mr. Burney stepped in.

Appellant first alleges that trial counsel was ineffective for failing to object and/or request cautionary, limiting instructions when the Commonwealth introduced evidence of his prior crimes or bad acts, *i.e.*, his marijuana possession and subsequent discipline.[6] The Commonwealth contends, and the PCRA court opinion concludes, that this claim was previously litigated.

A claim is previously litigated if the "highest appellate court in which the petitioner could have had review as a matter of right has ruled on the merits of the issue." 42 Pa.C.S. § 9544(a)(2). On direct review, this Court determined that evidence of appellant's prior crimes, namely his possession of marijuana and the discipline he received as a result, were relevant to establishing a motive for the murder. *Bryant*, 574 A.2d at 594. *See* Pa.R.E. 404(b)(2) ("Evidence of other crimes, wrongs, or acts may be admitted for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity or absence of mistake or accident.").

▇▇▇ Appellant asserts that this claim was not previously litigated because he is now focusing on counsel's failure to request a cautionary instruction, rather than the admissibility

---

6. Appellant's claim is ambiguously broad, apparently covering additional bad acts that came in at trial, including appellant's "prior criminal acts and allegations of prior violent behavior." Brief of Appellant at 19. Although appellant concedes that, as the murder occurred in prison, "[s]ome of this evidence was unavoidable" and "inevitable," *id.* at 19, 21, he asserts that some or all of this evidence was so prejudicial as to render its admission without a cautionary instruction reversible error.

of the evidence.[7] But even assuming that this is a distinct claim, appellant is not entitled to relief since the claim implicates appellant's self-representation. Failure to request a cautionary instruction upon the introduction of evidence constitutes a waiver of a claim of trial court error in failing to issue a cautionary instruction. *See Commonwealth v. Wallace,* 522 Pa. 297, 561 A.2d 719 (1989) (trial counsel's failure to object when trial court did not issue cautionary instruction following introduction of evidence of defendant's prior incarceration resulted in waiver of any claim of error based upon trial court's failure to give cautionary instruction); *Commonwealth v. Jones,* 501 Pa. 162, 460 A.2d 739 (1983) (issue waived where defense counsel immediately objected to prosecutor's conduct but failed to request mistrial or curative instructions). The complained-of evidence was introduced by the Commonwealth while appellant was acting as his own counsel and appellant did not object to the admission of that evidence or request a contemporaneous cautionary charge. Appellant may not raise ineffectiveness claims that challenge his own performance as counsel. *See Faretta,* 422 U.S. at 834 n. 46, 95 S.Ct. 2525; *Szuchon,* 484 A.2d at 1377. Accordingly, no relief is due on this claim.

Appellant next contends that trial counsel was ineffective for failing to object to, or otherwise address, State Trooper Walter Knaus' testimony remarking upon appellant's post-*Miranda*[8] silence. Appellant asserts that trial counsel should have raised the issue in a pre-trial motion *in limine,* in a belated request for a proper cautionary instruction or mistrial,

---

7. Appellant argues that this Court's decisions in *Commonwealth v. Buehl (I),* 510 Pa. 363, 508 A.2d 1167 (1986) and *Commonwealth v. Buehl (II),* 540 Pa. 493, 658 A.2d 771 (1995), refute that this claim is previously litigated. Appellant notes that the appellant in *Buehl (I),* unsuccessfully appealed the trial court's admission of evidence of prior crimes and then, on post-conviction review, in *Buehl (II),* successfully appealed the trial court's failure to issue cautionary instructions regarding that evidence. It is axiomatic that "[c]ases are authority only on questions they decide." *Hill & MacMillan, Inc. v. Taylor,* 304 Pa. 18, 155 A. 103, 104 (1931). The *Buehl (II)* Court never discussed previous litigation of the issue. Accordingly, this argument fails.

8. *Miranda v. Arizona,* 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966).

and/or in a post-verdict motion. At trial, Trooper Knaus testified regarding his investigation of Chapman's murder, and noted that appellant had signed a "waiver of rights" form, gave a brief statement and then refused to cooperate further:

Q. [Prosecution:] . . . did [appellant] give you some type of statement as to his involvement in the death of Mr. Chapman?

A. [Knaus:] **He gave me a short statement and then elected to quit.**

Q. Now, before you conducted this interview with him, did you go through any procedure with him?

A. Yes. Normal procedure is a waiver of rights "Your Rights" form which is basically a time, the place, my name, witnesses and all his rights.

\* \* \*

Q. All right. What was it that [appellant] told you in regard to—

A. [Appellant] explained to me that Abe Chapman was a friend of his; that he knows that Mr. Chapman on at least two occasions snitched on him; and he didn't particularly like that. That the day of the incident, he was up in another cell talking to an inmate named Smith and **at that particular point cancelled the interview and said he would see us in court.**

N.T 3/26/87, 255, 260 (emphasis added). Appellant avers that the Commonwealth's closing argument exploited his eventual silence by referring to a "code of silence" among inmates: "Mr. Greer, [appellant], not going to tell them, but you see, Mr. Chapman did . . . and that's why he died." N.T. 3/30/87, at 493. In forwarding this claim, appellant argues that this case is "indistinguishable" from *Commonwealth v. DiPietro*, 538 Pa. 382, 648 A.2d 777 (1994), where this Court concluded that testimonial reference to a defendant's post-arrest silence, the absence of an adequate cautionary instruction, and the further exploitation of the defendant's post-arrest silence dur-

ing closing argument is *per se* prejudicial and requires a new trial. *Id.* at 782.[9]

The Commonwealth counters that, even assuming this claim is not waived as a result of appellant's self-representation, Trooper Knaus' unsolicited response to the Commonwealth's direct-examination was permissible because it merely referred to how appellant concluded the interview. Further, the Commonwealth argues that it did not exploit the comment in its closing argument, which merely referred to appellant's **motive** for killing Chapman: *i.e.,* he was a "snitch" who failed to honor the "code of silence" followed by appellant and Greer.

The PCRA court concluded that this claim of counsel ineffectiveness is not reviewable because appellant was acting as his own counsel when Trooper Knaus·testified and he failed to object. We agree. Indeed, appellant implicitly concedes that he cannot challenge testimony that was admitted during the period of self-representation by focusing instead upon those stages of trial when appellant was represented by counsel, *i.e.,* pre-trial, jury charge, and post-trial. However, appellant, acting as his own counsel at the time Trooper Knaus actually testified, had a full opportunity to raise any objection and/or request any relevant cautionary instructions based upon what actually transpired.[10] Appellant's failure to do so contempora-

---

**9.** We note that *DiPietro* did not exist when appellant was tried in March of 1987. It is a settled rule that "we will not deem counsel ineffective for failing to anticipate a change in the law." *Commonwealth v. Rollins*, 558 Pa. 532, 738 A.2d 435, 451 (1999). Hence, strictly speaking, the *DiPietro* decision can command no result here, where the claim sounds in ineffective assistance.

**10.** It is notable that any advantage counsel may have achieved by addressing appellant's alleged "post-arrest silence" pre-trial would have been undermined by appellant himself at trial since on cross-examination, appellant elicited the same allegedly impermissible post-arrest silence reference from Trooper Knaus:

Q. And you asked me—do you recall what you asked me?
A. Well, after I read you your rights—
Q. After you read me my rights.
A. Then I asked you to tell me what you knew about the Abe Chapman killing.
Q. And I told you what I knew; is that correct?
A. You told me up to a point and quit and said, I'll see you in court.
N.T. 3/26/87, at 272.

neously with the testimony waived the issue. *See* PA. R.CRIM.P. 302(a); *Commonwealth v. Burkholder*, 528 Pa. 119, 595 A.2d 59 (1991) (failure to raise contemporaneous objection to evidence at trial waives claim on appeal). Appellant may not rely upon his own lack of legal expertise as a ground for a new trial, *see Faretta*, 422 U.S. at 834 n. 46, 95 S.Ct. 2525; *Szuchon*, 484 A.2d at 1377; and we will not allow him to bootstrap from his own failure to raise the claim by blaming counsel for failing to remedy his own mistake.

In his next claim, appellant alleges that trial counsel was ineffective for failing to request an instruction on the defense of alibi because the testimony of his accomplice, Greer, tended to establish such a defense. In response, the Commonwealth argues, and the PCRA court determined, that appellant was not entitled to an alibi instruction because he failed to file a notice of alibi defense and, in any event, did not establish an alibi defense. We agree.

 An alibi is "a defense that places the defendant at the relevant time at a different place than the scene involved and **so removed therefrom as to render it impossible for him to be the guilty party.**" *Commonwealth v. Mikell*, 556 Pa. 509, 729 A.2d 566, 570 (1999) (quoting *Commonwealth v. Kolenda*, 544 Pa. 426, 676 A.2d 1187, 1190 (1996)) (emphasis added). "Where such evidence has been introduced, a defendant is entitled to an alibi instruction to alleviate the danger that the jurors might impermissibly view a failure to prove the defense as a sign of the defendant's guilt." *Mikell*, 729 A.2d at 570.

 Initially, we note that appellant does not allege that trial counsel was ineffective for failing to file a mandatory notice of alibi defense pursuant to PA.R.CRIM.P. 573(C)(1)(a) (then-rule 305), which provides that: "A defendant who intends to offer the defense of alibi at trial shall, at the time required for filing the omnibus pretrial motion ... [file notice of Alibi Defense]." Accordingly, counsel was in no position to demand an alibi charge. In any event, Greer's testimony, if believed, did not establish appellant's presence elsewhere or

that it was impossible for appellant to be the killer. Greer—whose blood-type was found both at the scene of the crime and on appellant's jacket—testified that he was alone with Chapman in Chapman's cell when a masked assailant entered. He claimed that, after fighting off the assailant's knife attacks and sustaining cuts to his left hand, he left Chapman alone with his assailant and fled to the other end of the prison range, where he saw appellant washing his clothes in a slop sink:

Q. [Defense Counsel:] Now, when you left [Chapman's] cell, did you see Mr. Chapman or did you see this person as you left or did you hear what was going on or anything?

A. [Greer:] Did I see him as I left?

Q. Did you see anything as you left; I mean, you left the cell, I'm saying do you have any indication—

A. I didn't look back; no, sir.

Q. Okay. You didn't look back so you don't know what happened to him after that?

A. No, sir.

Q. When you left, where did you go?

A. I went down to B Range and, um, near the—they have a sink at the divide. And I stopped there to, um, try to wash my hand. Someone was there, you know, I wanted to see how bad it was cut and I continued on to the other side of the range which is, um, I think I Range if I'm correct. And just kept running to the back of the block.

Q. You said you went to the divide to see how bad your hand was cut and you wanted to use the sink?

A. Yes, sir.

Q. And you said—did you know who was there?

A. Um, it was a couple individuals there at the time because they just pulled the bar and, um—

\* \* \*

Q. Now, when [the police] were questioning you, just in general now; I've asked you did you ever identify

anybody at the divide where you ran past it where you said there was one or two individuals or whatever?

A. Did I ever identify anyone? Yes.

Q. Who was that?

A. I told—he asked me before did I recall seeing [appellant] there and I told them yes. He was there washing clothes. I told them when I tried to get in to wash my hand, he stopped me like, you know, get out of the way, he didn't want no blood on his clothes or something.

N.T. 3/26/87, 358, 364.

■ Greer's testimony, if believed, was certainly exculpatory, as it was eyewitness testimony that a masked man, and not appellant, was the killer. This was affirmative evidence in appellant's favor. Inferentially, of course, testimony that "A" is the killer excludes all others. But it does not place any of those others at any particular place, so as to establish an alibi. Indeed, since Greer was not in two places at once, but rather was only at the scene of the crime, he was in no position to establish *anyone's* presence elsewhere, much less an "alibi." "Trial counsel cannot be held to be ineffective for failing to take futile actions or raise a meritless claim." *Commonwealth v. Howard*, 538 Pa. 86, 645 A.2d 1300, 1304 (1994). Since Greer's testimony did not establish an alibi, counsel was not ineffective.

Appellant next second-guesses trial counsel's closing argument, alleging that he was ineffective because he supposedly conceded appellant's involvement in the murder and failed to articulate appellant's theory of the case. On review of the record, the PCRA court concluded that this claim lacks merit. We agree.

■ As the U.S. Supreme Court recently noted unanimously in *Yarborough v. Gentry*, 540 U.S. 1, 124 S.Ct. 1, 157 L.Ed.2d 1 (2003) (*per curiam* ), review of a defense attorney's summation is highly deferential:

The right to effective assistance extends to closing arguments. Nonetheless, counsel has wide latitude in deciding how best to represent a client, and deference to counsel's

tactical decisions in his closing presentation is particularly important because of the broad range of legitimate defense strategy at that stage. Closing arguments should "sharpen and clarify the issues for resolution by the trier of fact," but which issues to sharpen and how best to clarify them are questions with many reasonable answers. Indeed, it might sometimes make sense to forgo closing argument altogether. Judicial review of a defense attorney's summation is therefore highly deferential....

*Id.* at 5–6, 124 S.Ct. at 4 (citations omitted). A review of trial counsel's closing argument in its entirety demonstrates that counsel adequately discussed the Commonwealth's burden of proof, the presumption of innocence and the degrees of homicide, the deficiencies and weaknesses in the Commonwealth's evidence, and the defense theory. To that end, trial counsel noted that the Commonwealth's key witnesses were fellow inmates who had violated the law, and reminded the jury that they were free to disbelieve them. Counsel suggested that two key Commonwealth witnesses, Hill and Ezzo, may have received favorable treatment for their cooperation with authorities and asked the jury to take this into account when considering the truthfulness of their testimony. Moreover, counsel reminded the jury that Hill's testimony provided the sole link between appellant and the "shank" used to kill Chapman, but that Hill was the only person who had actually been seen with the murder weapon. Counsel further observed that the Commonwealth had failed to investigate Hill, despite his admitted disposal of the murder weapon, and argued that authorities may have rushed to judgment by focusing their investigation exclusively upon appellant. Finally, counsel asserted that the Commonwealth's theory regarding appellant's motive—*i.e.,* that Chapman was a snitch—was undermined by the fact that appellant had promised Ezzo that he would not hurt him, and indeed did not hurt him, even though he knew Ezzo was himself a "snitch" who had implicated appellant in the murder.

In attacking counsel's performance, appellant now baldly states that "[c]ounsel's abject failure to competently portray

the evidence and put forth a coherent defense theory in his closing argument constitutes a constructive denial of counsel that mandates relief." Brief of Appellant at 40. The notion of constructive denial is meritless. Counsel stressed the defense points, attacked the Commonwealth's evidence, and reminded the jury of its responsibility to be fair and impartial.

 Nor does appellant's claim succeed under *Strickland* analysis. Indeed, rather than view the closing as a whole and from counsel's perspective, appellant insists on highlighting fragments of argument, taken out of context. For example, appellant cites the following portion of the closing argument where, he contends, trial counsel failed to draw the jury's attention adequately to two defense witnesses, Greer and John McAndrews:

Mr. Greer. He was already in custody, interviewed advised of his rights and had cuts on his hands. Commonwealth says, well, how did you get these cuts? He explained. He really didn't give the Commonwealth anything that could help the Commonwealth at that particular point. Commonwealth did not use Mr. Greer. Mr. Greer in essence was not cooperative.

Mr. McAndrews, of course, he testified. He said he didn't tell anybody at first. He told you why. Commonwealth said, you mean you waited all this time? All this time before? Seems like the Commonwealth doesn't want to believe two "inmates" who are called by the defense but would have you believe that inmates called by the Commonwealth are somewhat different.

N.T. 3/30/87, 480–481. We see nothing deficient in this performance. Rather, counsel made the effective point that the Commonwealth chose to call only those inmates who supported its theory, and suggested that the Commonwealth employed a double standard in deciding which inmate could be believed. Simply because another lawyer may have made the point differently does not render counsel's closing ineffective.

 Appellant also avers that trial counsel improperly vouched for the credibility of Hill and Ezzo when he stated in

his closing argument: "I can't say that neither one of them are telling the truth. I mean, I cannot stand here and say that they are not telling you the truth . . . ." N.T. 3/30/87, at 481. But appellant takes this statement out of context since he fails to note that, in the very next breath, trial counsel questioned the credibility of those witnesses:

> See, because I was not there back on May 15th . . . But at the same time I can't say Larry Greer wasn't telling the truth or John McAndrews wasn't telling the truth in the same vein. Mr. Hill, Mr. Ezzo, in and out of jail. They have been out on parole, back in jail, out on parole. We're supposed to trust them? Maybe we can, maybe we can't.

*Id.* In any event, jurors may react against a lawyer who they think is blatantly trying to limit their freedom of thought and, thus, "a low-key strategy that stresses the jury's autonomy is not unreasonable." *Gentry,* 540 U.S. at 10–11, 124 S.Ct. at 7.

Appellant further claims that counsel unwisely invited the jury to believe Hill's testimony that appellant gave him the murder weapon:

> You have a right to look at hearsay evidence as opposed to what someone has said and then testified to; but of course stronger evidence would be when something is physical, he has a backup in the physical sense versus something that's just hearsay, that doesn't mean you ignore hearsay evidence, doesn't mean just because when JoJo Hill took the stand and he said so and so gave me the knife; doesn't mean you ignore that because it could be the truth. . . .

N.T. 3/30/87, at 458. Once again, appellant's argument is based on a selective reading; he does not quote the remainder of the last sentence, which continues as follows: "but it means as if that's not substantiated with something else; and you should look into that in a harder sense." *Id.* Again, viewed in context, trial counsel effectively reminded the jurors that they were free to discount Hill's testimony and, in so doing, stressing that no one could be sure who was telling the truth. "This is the very essence of a reasonable-doubt argument." *Gentry,* 540 U.S. at 10–11, 124 S.Ct. at 7.

■ Appellant further asserts that trial counsel "abandoned" him when, in discussing Ezzo's testimony, he "essentially acknowledged that [appellant] had given the knife to JoJo Hill":

> Without Mr. Ezzo? We have of course, if there was a killing, we have in fact that [appellant] gave Mr. Hill the knife. He didn't tell Mr. Hill what he did with the knife. He didn't tell anyone else what happened. As a matter of fact, without Mr. Ezzo, we have no motive. We have no first degree murder; and as I mentioned, that's my opinion now.

N.T. 3/30/87, 472. Again, context is ignored, for trial counsel specifically challenged the credibility of Hill; indeed, he suggested that Hill himself may have been a suspect in the murder, but for his cooperation with authorities. *See* N.T. 3/30/87, 482, 483.

■ Additionally, appellant charges that trial counsel "abandoned" appellant by "inviting the jury to convict his client," with the following statement: "Of course it wouldn't be a tragedy if the right person was convicted; and that's for you to decide. It's not for me to hammer it into you that [appellant] is not guilty." N.T. 3/30/87, at 455. But again, this is not all that counsel said. Counsel went on to explain that the question of guilt or innocence is for the jury:

> It's not for the prosecution to hammer it into you that he is guilty. It's for you to understand the positions that we take and it's for you to decide because when you come back out and stand there and I look at the decision you make; as long as you have gone through the process, gone out there and holding firm to your beliefs; as far as what you think this case is and making a decision; you won't have any problem with me. Shouldn't have any problem with the Commonwealth as long as you uphold your duty.

*Id.* Trial counsel did not concede appellant's guilt. In this case turning on credibility, he reminded the jury that the decision was theirs, not the Commonwealth's. Trial counsel's failure to profess appellant's innocence before the body that was to make that decision was "precisely the sort of calculated

risk that lies at the heart of an advocate's discretion." *Gentry*, 540 U.S. at 8–10, 124 S.Ct. at 6.

 Finally, appellant asserts that trial counsel "compounded his abandonment" by drawing the jury's attention to the possibility that the victim's blood was on appellant's coat when the evidence demonstrated that the blood could not have belonged to the victim. This abandonment allegedly occurred when counsel emphasized the inconclusiveness of the blood evidence, as follows:

> What we have here as far as blood is he testified three different blood types as far as [appellant], Mr. Chapman and Mr. Greer; but you notice he also said it's not exact. **We don't know whether the blood that was on [appellant's] coat was actually Mr. Chapman's.** It was consistent with his and 150 others in approximate terms.

N.T. 3/30/87, at 459 (emphasis added). The Commonwealth concedes that trial counsel misspoke in stating that the blood found on appellant's coat was consistent with Chapman's blood, rather than Greer's. However, counsel correctly noted that fact just prior to the misstatement appellant cites in his brief:

> You know that when guards went to [Chapman's] cell, there was evidence that a crime had been committed. You know that there were samples of clothing that was taken and sent to the Crime Lab even though we didn't see those here in court. There was analysis of the knife, **the analysis of a piece of clothing of [appellant] that had a nickel spot of blood that he testified was consistent with that of Larry Greer** on his shoulder; and you notice when I said consistent we take certain basis and then we expand sometimes as far as what our theories are.

*Id.* (emphasis added). The jury, of course, was reminded that the arguments of counsel are not evidence. This single misstatement, in context, did not render counsel ineffective.

Trial counsel's summation reflected a reasonable approach stressing jury autonomy, downplaying the testimony of suspect witnesses, and attempting to plant the seeds of reason-

able doubt. Given the deference which necessarily attends review of such an inherently subjective aspect of trial lawyering, appellant's claim fails.

Appellant next contends that trial counsel was ineffective for failing to consult with and present a forensic expert, *i.e.*, a blood splatter expert, who supposedly could have refuted the Commonwealth's theory of the case. The Commonwealth responds that appellant failed to identify a proposed expert witness in his amended PCRA petition. The PCRA court opinion agrees, and further concludes that appellant "did not establish how a report from such an expert would prove that [appellant] did not stab Mr. Chapman fifteen times in his cell." PCRA slip op. at 10.

In *Commonwealth v. Williams*, 537 Pa. 1, 640 A.2d 1251, 1265 (1994), this Court noted the well-settled rule that, in addition to the ineffectiveness test, "[w]hen a defendant claims that expert testimony should have been introduced at trial, the defendant must articulate what evidence was available and identify the witness who was willing to offer such evidence." *Id.; see also Commonwealth v. Holloway*, 524 Pa. 342, 572 A.2d 687 (1990). Appellant's amended PCRA petition failed to identify a witness who was willing to offer this expert testimony. Appellant now simply asserts that H. Dale Nute, Ph.D., has reviewed the testimony in this case and has concluded that blood splatter analysis is warranted. Since appellant failed to make this proffer below, he cannot make it now. Moreover, appellant's bald assertion that Dr. Nute's expert testimony on blood splatter could have refuted the Commonwealth's theory of the case is purely speculative. Appellant fails to show how this evidence, in light of the other evidence, would have changed the outcome of the trial. Accordingly, this claim fails.

We next address the two ineffectiveness claims that most clearly challenge appellant's performance during self-representation, in violation of *Faretta/Szuchon*. In issue seven, appellant contends that trial counsel failed to challenge the credibility of Hill, the Commonwealth witness who testified that appellant gave him the murder weapon and told him to

dispose of it. Appellant avers that counsel should have cross-examined Hill concerning a glove that was discovered in the bag along with the discarded murder weapon. Appellant declares, without further explanation, that "the unexplained presence of the glove suggests that Hill had worn the glove while he stabbed the deceased." Brief of Appellant at 48. In a similar claim in issue eight, appellant argues that trial counsel was ineffective for failing to object when the prosecutor "repeatedly sought to bolster the credibility of his witnesses through the use of inadmissible evidence and impermissible comments." Brief of Appellant at 51. The PCRA court determined that both of these claims failed because appellant conducted the cross-examination of these witnesses. We agree. Appellant may not rely upon his own lack of expertise as a ground for relief. *See Faretta*, 422 U.S. at 834 n. 46, 95 S.Ct. 2525; *Szuchon*, 484 A.2d at 1377.

As part of issue seven, however, appellant also argues that trial counsel was ineffective for failing to present nine additional inmate witnesses, seven of whom testified at appellant's first trial, who supposedly could have undermined Hill's credibility as a witness and/or provided circumstantial evidence that Hill was the killer. Although the PCRA court did not directly address this part of appellant's claim, we conclude that our review is not thereby impeded, and thus, proceed to the merits.

To prevail on a claim that trial counsel was ineffective for failing to present a witness, a defendant must demonstrate that: (1) the witness existed; (2) counsel was either aware of or should have been aware of the witness's existence; (3) the witness was willing and able to cooperate on behalf of the defendant; and (4) the proposed testimony was necessary to avoid prejudice to the defendant. *Commonwealth v. Begley*, 566 Pa. 239, 780 A.2d 605, 630 (2001). Appellant provides affidavits for only five of the nine witnesses. Even as to these five, he fails to demonstrate that their proposed testimony was necessary to avoid prejudice.

 These witnesses offered conflicting versions of events which, in many cases, were also inconsistent with the witnesses' prior individual testimony. Three of the witnesses—Arthur Johnson, Craig Henry and Miles Gabler—aver in affidavits that it was Hill, not appellant, who killed Chapman. But the present claims of these inmates are vastly different from their testimony at appellant's first trial.[11] Appellant does not allege that counsel knew, or should have known, of the new and contradictory accounts of the witnesses. In addition to the fact that the new versions would be directly impeached with the testimony from the first trial, each witness was impeachable with his significant criminal history and questionable credibility—factors the Commonwealth exploited in securing a conviction at the first trial. Given the outcome of the first trial, the testimony of these three witnesses cannot rationally be characterized as necessary to avoid prejudice to

11. In Johnson's affidavit, he avers that when Hill arrived at SCI–Huntingdon, "he told me he had killed Chapman and set Bryant up for it." Johnson offered no such testimony at appellant's first trial. Rather, Johnson testified that, while he and Hill were in RHU at SCI Huntingdon, Hill stated that authorities had transferred him from SCI Pittsburgh and placed him in RHU because he refused to testify against appellant.

Henry's affidavit claims that "he overheard a conversation between Hill and a couple other inmates. Hill was talking about setting Bryant up for a murder." He further claims that, "When I turned around, I saw Hill pulling a shank out of his coat and showing it to other inmates." But, at the first trial, Henry testified only that, the night before the murder, he observed a "piece of steel" in Hill's coat as Hill sat with some fellow inmates in the gym. He could not describe it in detail and maintained that it remained in Hill's coat. On cross-examination, Henry conceded that he did not inform appellant of this potentially exculpatory information until two weeks before trial—more than two years after the murder. N.T. 4/9/86, at 354.

Gabler's affidavit states that "[Hill] confessed to me that he had killed someone named Chapman at SCI–Pittsburgh, but someone else was going to take the fall for it, Bryant," though he failed to mention this at the first trial. There, Gabler testified only that "[Hill] told me he was going to get out of jail for testifying against [appellant]. He said they would help him get out of jail, that [appellant] didn't commit the murder, but he was saying he did." *Id.* at 419, 648 A.2d 777. On cross-examination, Gabler conceded that he had lied under oath in another proceeding, and that he had killed a man because he was a "snitch." *Id.* at 425, 427, 648 A.2d 777.

appellant, such that counsel can be deemed required to have called them.

 Two additional witnesses, George Brown and Albert Byrd—neither of whom testified at the first trial—also claim in affidavits that it was Hill, not appellant, who killed Chapman. Neither inmate saw the killing.[12] Indeed, Brown does not claim to have any first-hand, personal knowledge that Hill committed the murder. Further, Brown's claim that he saw Hill dispose of something in the trash is cumulative of other testimony and, indeed, is consistent with Hill's own testimony that he disposed of the murder weapon.

Byrd's affidavit, which claims that he was with appellant at the time of the murder, is undermined by appellant's previous offer of proof at trial. During the pre-trial conference, while appellant was acting as his own counsel, appellant stated that Byrd would testify only that John Bradley, a Commonwealth witness, "made a statement like, he should get [appellant] because they locked me up for doing something to his friend which was Abe Chapman." N.T. 3/25/87, at 82. Appellant presented the following statement from Byrd:

> To whom it may concern: I, Albert D. Byrd, do admit the following statement is true and exact to the best of my knowledge. Number one, I know John Bradley. Number two, John Bradley made a statement to me concerning an

12. Brown's affidavit states that he saw Greer, with blood on his hands, stumbling away from the scene of the crime; that he saw Hill "putting something in one of the trash bins"; that prison authorities initially suspected that he was the "lookout" for the murder; and, that "[m]ost of us guys knew that Hill killed Chapman over a disputed drug deal because Chapman was going to cut Hill off from the drugs." Brown does not allege the basis for that knowledge. Brown further claims that investigators were only interested in stories that corroborated their theory that appellant was guilty, and that they "never asked me anything about Hill."

Byrd's affidavit claims that he was with appellant at the time of the murder: "I clearly remember that [appellant] and I had a long conversation that morning and we were talking when the commotion started about the murder of Chapman. . . . I knew right away that Hill was responsible for Chapman's murder." Byrd likewise did not say how he "knew" Hill was the killer.

incident that involved [appellant] at SCIP during the early part of May, 1984. Respectfully, Albert D. Byrd . . . . *Id.* at 81–82. Appellant never suggested that Byrd would testify that he was with appellant at the time of the murder, nor did he state that Byrd would implicate Hill in the murder. Nor does appellant now suggest that counsel should have known that Byrd would testify to alibi, rather than to the corrupt motive of a Commonwealth witness.

Appellant next asserts that trial counsel should have presented the testimony of Bruce Johnston, Andre Harris, Bennie Graves and George Brooks. Appellant does not submit affidavits from these witnesses, but instead relies upon their testimony at appellant's first trial, and suggests that they could have impeached Hill's testimony at the second trial.

Johnston testified that Hill had said that authorities promised him favorable treatment if he testified against appellant. Johnston conceded on cross-examination that he was convicted of six homicides for killing six potential witnesses against him in connection with a separate burglary charge, and that he had recently been charged with killing a fellow inmate. N.T. 4/9/86, at 444–45.

Harris testified that Hill asked him whether he knew "somewhere he could buy a shank." Harris conceded on cross-examination that he had only been at the prison for two weeks at the time of Hill's alleged request, yet maintained that he had a reputation as the "weapons man." Harris also admitted that he had not told appellant or authorities about Hill's alleged request for a weapon until almost two years after appellant, whom he said was his friend, had been accused of the murder. *Id.* at 323.

Graves testified that Hill claimed to have had a sexual relationship with Chapman, and would "fix him" after discovering that Chapman was involved in a sexual relationship with someone else. On cross-examination, Graves could not explain why this was the only time that Hill, who was not a friend of his, had discussed his homosexuality with Graves. Moreover, he conceded that he had never revealed Hill's statement to

authorities. Further, Graves admitted that he had been convicted for various crimes involving falsehood.

Brooks claimed at the first trial that, "I'm a thief, but not a liar," *id.* at 388, and maintained that Hill had told him that he had killed Chapman. He too failed to share this information with authorities, but maintained that it was his "duty" to testify on behalf of an inmate "who is being framed by another prisoner whose character is so blatant it's pathetic—he owes everybody. He locks up. He's a homosexual. He's a liar." *Id.* at 398.

Appellant made no proffer as to whether these witnesses were willing and able to testify at appellant's second trial, much less that they would stick to their stories. Even if they were willing to testify and did so consistently with their earlier testimony, given the result at the first trial, we cannot say that counsel was obliged to call them again.

Accordingly, appellant cannot prevail on his claim that trial counsel was ineffective for failing to present these witnesses. Given the nature of the proffered testimony, which was often contradictory, their testimony cannot be characterized as necessary to avoid prejudice to appellant. *Begley,* 780 A.2d at 630.

In appellant's ninth claim, he argues that trial counsel was ineffective for failing to object to the trial court's progression charge, which instructed jurors to consider the most serious charge of criminal homicide before moving on to any lesser charges. Appellant contends that this kind of jury instruction "presents a serious due process issue" by supposedly coercing jurors who might be opposed to convicting on a higher charge into voting for conviction before lesser offenses can even be considered. In response, the Commonwealth argues that the charge was proper because it provided the jury with a framework within which to consider logically the different elements of the degrees of homicide. The PCRA court concluded that the trial court's charge was proper.

The Superior Court has determined that progression charges are proper in homicide cases. *Commonwealth v.*

*duPont,* 730 A.2d 970 (Pa.Super.1999), *alloc. denied,* 561 Pa. 669, 749 A.2d 466 (2000); *Commonwealth v. Loach,* 421 Pa.Super. 527, 618 A.2d 463 (1992), *alloc. denied,* 535 Pa. 655, 634 A.2d 219 (1993); *Commonwealth v. Hart,* 388 Pa.Super. 484, 565 A.2d 1212 (1989), *alloc. denied,* 525 Pa. 642, 581 A.2d 569 (1990). Moreover, appellant cites no Pennsylvania or U.S. Supreme Court authority for the proposition that a progression charge violates due process, and therefore obliged counsel to object.[13] Perhaps someday a relevant court will approve of appellant's theory. But that day has not yet come, and counsel cannot be deemed ineffective for failing to advance the change in the law. *Rollins,* 738 A.2d at 451 ("[w]e will not deem counsel ineffective for failing to anticipate a change in the law.").

Appellant's tenth and eleventh claims allege that he was not provided "a complete trial record." Appellant avers that the PCRA court should have required the production of the following documents: copies of pre-trial motions and answers filed at the first and second trials, and the notes of testimony from the proceedings in which the trial court considered those motions; a "copy of all discovery materials provided to trial counsel"; the criminal history records of Commonwealth witnesses Hill, Ezzo and Bradley; "a copy of all exhibits entered into evidence during trial or penalty phase" and crime-scene photographs; a copy of the jury verdict sheets for the guilt and penalty phases of the trial; the notes of testimony from all proceedings involving post verdict motions and sentencing; and, copies of all pleadings filed by either party during the direct appeal. It is difficult to determine from appellant's scattershot approach who he believes is obliged to secure these items for him, and why. He appears to argue that the Commonwealth has the duty; his PCRA petition, however, suggested that the Commonwealth, trial counsel and the trial

---

**13.** Appellant cites authority from other jurisdictions which disapproves jury instructions requiring *unanimous* acquittal or conviction on a higher offense before considering lesser offenses. *See People v. Hurst,* 396 Mich. 1, 238 N.W.2d 6 (1976); *State v. Ogden,* 35 Or.App. 91, 580 P.2d 1049 (1978).

court were so obliged. Appellant claims that he needs these documents to search for additional possible trial errors.

The Commonwealth counters that appellant has failed to establish the requisite "good cause" for post-conviction discovery. Also, the Commonwealth avers that appellant failed to provide proof in any of his pleadings as to the existence of relevant records, other than those revealed at trial and already available. Further, the Commonwealth asserts that many of the requested items are not in the District Attorney's possession, or are available from other sources. The Commonwealth further notes that the crime-scene photographs are in the Pennsylvania State Police's possession. It maintains that appellant should have directed its request there, rather than expecting the District Attorney to obtain the documents "as a paralegal on appellant's behalf." Brief of Appellee, at 60.

The PCRA court opinion concludes that appellant failed to establish the requisite "good cause" for discovery under Pa.R.Crim.P. 1502(E)(2) (now-Rule 902(E)(2)). We agree. We review the denial of a discovery request in post-conviction proceedings for an abuse of discretion. *See Commonwealth v. Chambers*, 570 Pa. 3, 807 A.2d 872, 889 (2002). Rule of Criminal Procedure 902(E)(2) provides that, in a first counseled PCRA petition in a death penalty case, "no discovery shall be permitted at any stage of the proceedings, except upon leave of court after a showing of good cause." Pa. R.Crim.P. 902(E)(2). "[A] showing of good cause requires more than just a generic demand for potentially exculpatory evidence...." *Chambers*, 807 A.2d at 889; *see also Commonwealth v. Abu–Jamal*, 553 Pa. 485, 720 A.2d 79, 91–92 & n. 15 (1998) ("wholesale discovery of whatever information [petitioner] 'believed' to exist and/or of entire files so that he could discern whether his assertions were true" exceeds permitted discovery). Appellant makes no effort to show good cause and, indeed, fails even to cite Rule 902(E)(2). Rather, appellant merely speculates as to possible trial court errors, or potentially exculpatory evidence, that may be discovered if post-conviction counsel has the opportunity to review "the

requested documents" and materials. Such unfocused and unsubstantiated speculation cannot satisfy Rule 902(E)(2)'s "good cause" requirement.

Moreover, appellant fails to explain why certain materials, including notes of testimony from "pre-trial and jury selection proceedings" had not been requested by trial/direct appeal counsel at the appropriate time, other than to offer the bald assertion that trial counsel was ineffective for failing to do so. Although appellant again obliquely speculates that there may be as-of-yet-undiscovered trial errors, he does not identify any specific claim that trial/direct appeal counsel could have made, or should have made, based upon the notes. Counsel cannot be held ineffective in a vacuum. *See Commonwealth v. Edmiston*, 851 A.2d 883 (Pa.2004). Appellant has failed to rebut the presumption that counsel was effective in this regard.

We are puzzled, and not a little dismayed, by appellant's allegation that he is missing certain documents, and by his suggestion that the Commonwealth was obliged to produce them for him, as our review reveals that those documents are, in fact, in the record. For example, appellant's brief avers that he repeatedly requested, and was denied, copies of motions to dismiss pursuant to Rule 1100 and to quash on the ground of double jeopardy, as well as other pre-trial motions, that were filed at appellant's first trial. These documents are in the record. Although we are unable to find copies of pre-trial motions filed at appellant's second trial, this is no doubt explained by the fact that trial counsel merely orally "renewed" the motions from the first trial, which he explained were already "in the record" with supporting briefs. At the second trial pre-trial proceedings, counsel argued, and the trial court denied—on the record—previously argued motions, including renewed motions to dismiss pursuant to Rule 1100 and to quash on the ground of double jeopardy. Other pre-trial motions that counsel raised at the first trial and again argued at the second trial—but which appellant does not specifically mention in his brief—include a motion for trial by bifurcated jury and a petition to prohibit death qualification of

the jury. *See* N.T. 3/23/87, at 1–50.[14] These too are in the record with supporting briefs. Our review reveals that other requested documents, such as jury verdict slips are also in the record. It is not the duty of this Court, or of the PCRA court for that matter, to sift through the sort of irresponsible, shotgun request that was made here, to see what is already available and what is not. Since most if not all of the items which appellant's counsel blame the Commonwealth for failing to deliver are in fact available in the record, appellant's discovery/due process claim fails.

Appellant also forwards the related assertion that the Commonwealth had a duty to disclose "the materials requested" under *Brady v. Maryland,* 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963). In *Brady,* the U.S. Supreme Court held that "the suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of good faith or bad faith prosecution." *Id.* at 87, 83 S.Ct. 1194. For a defendant to establish a *Brady* violation, he must show that: (1) the evidence was suppressed by the State, either willfully or inadvertently; (2) the evidence at issue is favorable to the defendant; and (3) the evidence was material, meaning that prejudice must have ensued. *Strickler v. Greene,* 527 U.S. 263, 281–82, 119 S.Ct. 1936, 144 L.Ed.2d 286 (1999). "The mere possibility that an item might have helped the defense, or might have effected the outcome of the trial, does not establish materiality in the constitutional sense." *United States v. Agurs,* 427 U.S. 97, 109–10, 96 S.Ct. 2392, 49 L.Ed.2d 342 (1976). Although appellant's purported *Brady* claim is ambiguously broad, he specifically alludes to "photographs and exhibits" that may be exculpatory. Appellant does not attempt to show whether, or how, the "exculpatory" evidence has been suppressed by the Commonwealth, let alone whether it is "material," or indeed,

14. At the second trial, trial counsel forwarded two motions for the first time: a motion to sequester the jury and a motion to allow appellant to serve as co-counsel. These motions appear to have been presented, argued, and denied orally.

whether it is even exculpatory. Accordingly, this purely speculative claim fails.

Appellant also argues that the cumulative effect of the errors alleged herein denied him a fair trial. "[N]o number of failed claims may collectively attain merit if they could not do so individually." *Commonwealth v. Williams,* 532 Pa. 265, 615 A.2d 716, 722 (1992). Because we have determined that there were no errors warranting relief, appellant's allegation of cumulative error fails.

Finally, appellant alleges in a cursory manner that the PCRA court erred by not holding a hearing on certain of his arguments. A PCRA court may deny a petition without a hearing if, following a review of the petition, it determines a hearing would serve no purpose. PA.R.CRIM.P. 1509(C)(1) (now codified as Rule 909(C)(1)). Because we have determined that appellant's claims are either waived or meritless, the PCRA court did not abuse its discretion in denying appellant's petition without first holding a hearing. *Commonwealth v. Thomas,* 560 Pa. 249, 744 A.2d 713, 717 (2000).

For the forgoing reasons, we affirm the order of the PCRA court.

Justice SAYLOR files a dissenting opinion.

Justice SAYLOR.

## DISSENTING OPINION

I agree with the majority that a criminal defendant is charged with the consequences of a knowing, voluntary, and intelligent waiver of counsel at trial. The majority appears to frame these consequences categorically, *see* Majority Opinion, *op.* at 146–47, 855 A.2d at 741–43 ("Because appellant waived his right to counsel and asserted his right to self-representation, ... we will not consider any ineffectiveness claims that arise from the period of self-representation."), without any express consideration of the line of cases cited in Appellant's brief holding that a failure on the part of standby counsel to

adequately perform the limited role assigned to him by a trial court can implicate errors of constitutional dimension. *See* Brief of Appellant at 18–19 & n. 14.[1] Since Appellant has presented at least one of his issues in such terms, *see* Brief of Appellant at 54, I believe that the Court should expressly address the question in light of the relevant arguments and authorities. On review of the record and with the relevant principles in mind, in the end I am able to join the majority's ultimate disposition of this claim.

I also differ with the majority's approach to Appellant's claim of ineffectiveness for the failure to call witnesses, as I believe that Appellant should have been afforded an evidentiary hearing. Pennsylvania Rule of Criminal Procedure 909 requires an evidentiary hearing, unless it can be said, *inter alia,* that there are no genuine issues of material fact in dispute. *See* Pa.R.Crim.P. 909(b). Appellant has alleged ineffective assistance of counsel in the failure to present witnesses at trial, and has submitted an evidentiary proffer which includes affidavits from five witnesses which, if credited by a fact finder, would implicate another individual as the killer. Therefore, under Rule 909(b), I believe that a hearing was warranted. *Accord Commonwealth v. Williams,* 557 Pa. 207, 231–33, 732 A.2d 1167, 1180–81 (1999) (remanding for the post-conviction court to hold a hearing to make an independent credibility determination as to recantation testimony).

The majority lays out a fairly compelling case to support its proposition that the proffered affidavits simply are not credible and, therefore, an evidentiary hearing is not necessary. This determination, however, is made from the appellate van-

---

1. *See also People v. Bloom,* 48 Cal.3d 1194, 259 Cal.Rptr. 669, 774 P.2d 698, 718 (1989) ("To prevail on a claim that counsel acting in an advisory or other limited capacity has rendered ineffective assistance, a self-represented defendant must show that counsel failed to perform competently within the limited scope of the duties assigned to or assumed by counsel . . . ." (emphasis omitted)); *see also Ali v. United States,* 581 A.2d 368, 379–80 (D.C.Cir.1990) (same); *Downey v. People,* 25 P.3d 1200, 1204 (Colo.2001) (same); *State v. Thomas,* 331 N.C. 671, 417 S.E.2d 473, 478 (1992) (same); Anne Bowen Poulin, The Role of Standby Counsel in Criminal Cases: In the Twilight Zone of the Criminal Justice System, 75 N.Y.U. L.Rev. 676, 725–735 (2000).

tage in the first instance, on a cold record, without the benefit of any input from a fact finder. Nor does the majority articulate a general rule concerning when it will and will not permit summary disposition of a claim based on an evidentiary proffer that, if believed, would undermine the reliability of the verdict and sentence. The rule thus appears to be that if the common pleas court believes that at least four members of this Court will ultimately say that they do not believe the evidentiary proffer, then no hearing is necessary.

My position is that the Court would give better effect to the values of regularity and fairness that are essential to the judicial function by requiring closer and more consistent adherence to the procedures that have been designed to ensure the reliability of criminal convictions, particularly in the capital arena, where the need for reliability is at its greatest. Accordingly, I would remand for an evidentiary hearing and appropriate fact finding and decision making at the common pleas level regarding Appellant's proffer.