J-S40004-17

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | | |
|---|---|---|
| COMMONWEALTH OF PENNSYLVANIA | : | IN THE SUPERIOR COURT OF |
| | : | PENNSYLVANIA |
| | : | |
| v. | : | |
| | : | |
| | : | |
| RICHARD ALLEN COLLINS, | : | |
| | : | |
| Appellant | : | No. 3249 EDA 2016 |

Appeal from the Judgment of Sentence May 31, 2016
In the Court of Common Pleas of Montgomery County
Criminal Division at No(s): CP-46-CR-0004658-2015

BEFORE: OTT, DUBOW, JJ., and STEVENS, P.J.E.[*]

MEMORANDUM BY STEVENS, P.J.E.: **FILED JUNE 28, 2017**

Appellant Richard Allen Collins appeals the judgment of sentence entered in the Court of Common Pleas of Montgomery County on May 31, 2016, following a jury trial at which time he was sentenced to a consecutive term of life imprisonment following his convictions of first-degree murder, conspiracy to commit first degree murder, possession with intent to deliver a controlled substance (cocaine) and criminal conspiracy to possess a controlled substance with the intent to deliver.[1] We affirm.

The trial court detailed the relevant facts and procedural history herein as follows:

_____

[*] Former Justice specially assigned to the Superior Court.
[1] 18 Pa.C.S.A. §§ 2502(a), 903(a)(1); 35 Pa.C.S.A. § 780-113(a)(30).

Mariah Walton testified that she, [A]ppellant and the murder victim, Artie Bradley sold cocaine, crack cocaine and heroin from several locations in the Borough of Pottstown, Pennsylvania in 2014 and 2015.[11] Walton narrated to the jury while the prosecutors showed them a sequence of still photographs taken from a video recording Walton had made of a customer buying crack cocaine from [A]ppellant, with the assistance of Walton and Bradley, inside an apartment at 826 East High Street in Pottstown.[12]

Walton was [A]ppellant's lover;[13] and [A]ppellant and Bradley were "like brothers."[14] Bradley's relationship with the other two changed for the worse after [A]ppellant and Walton returned from a trip in early February, 2015, to find that "there was $10,000 worth of heroin money missing."[15] Appellant confronted Bradley, whose excuses were unpersuasive.[16] Appellant told Bradley he would have to pay the money back by way of future drug sales.[17] Although [A]ppellant tried to appear as if he "let it go" at that, he was still angry at Bradley[18] because (as Walton explained on cross-examination) "[t]here's no way you're going to work off $10,000."[19]

At approximately ten minutes before 10 p.m. on March 20, 2015, Sergeant Brian Rathgeb of the Pottstown Borough Police Department and a team of other police officers searched the area of the 400-500 blocks of Chestnut and Walnut Streets in Pottstown after being dispatched to investigate reports of gunshots.[20] They found no victim of a gunshot wound or other evidence of shots being fired in that area.[21] At approximately 11:30 p.m. Sergeant Rathgeb was dispatched to the nearby intersection of Beech and Washington Streets in Pottstown to investigate a call for an ambulance to treat an unresponsive person.[22] That person--Bradley--was already dead when the ambulance team had arrived.[23] Forensic pathologist Gregory McDonald, D.O., testified that he performed an autopsy of Bradley's remains and determined that Bradley had sustained seven gunshot wounds to the chest and abdomen, which caused fatal injuries to the lung and liver,[24] which he agreed were "vital parts of the body."[25] Mariah Walton testified,

> I was a knowing participant [in] the murder of Artie Bradley. I knew that [[A]ppellant] had a gun, and I knew he went there to get in a confrontation, and I not only watched him kill Artie Bradley, I drove him away from the crime scene and covered up for him.[26]

At the time [A]ppellant and Walton decided to commit the murder, they had just learned that Bradley was at the home of a

mutual friend, Troy Holmes, only a few blocks from the apartment [A]ppellant and Walton rented at 423 East High Street in Pottstown.[27] Appellant was expressing hostility toward Bradley, calling him derogatory names.[28] Appellant put a gun in his jacket pocket and told Walton he was leaving to confront Bradley and would telephone her when he was ready for her to pick him up in her car.[29] Approximately two minutes after [A]ppellant left, Walton drove her car to a vantage point on Washington Street where she could see when [A]ppellant and Bradley would leave the home of their mutual friend, and telephoned [A]ppellant to tell him she was waiting there.[30] Walton saw [A]ppellant and Bradley leave the home and cross the street together, then she saw [A]ppellant shoot Bradley twice, saw Bradley fall, and saw [A]ppellant shoot Bradley four more times as he lay on the ground.[31] Walton put her car in gear, appellant got in, and the two fled to Philadelphia.[32]

------

[11] N.T. 3-1-2016, pp. 92-93.
[12] *Id*. at 94-98.
[13] *Id*. at 89-90.
[14] *Id*. at 100.
[15] *Id*.
[16] *1d*. at 101.
[17] *Id*.
[18] *Id*.
[19] *Id*. at 160.
[20] *Id*. at pp. 49-52.
[21] *Id*. at 52.
[22] *Id*. at 52-53.
[23] *See* stipulation, N.T. 3-2-2016 ("Robin Yerger, a paramedic of Goodwill Ambulance, was the first responder to the murder scene. Artie Bradley was already dead upon her arrival.").
[24] N.T. 3-1-2016, pp. 69-72, 81.
[25] *Id*. at 79.
[26] *Id*. at 144.
[27] *Id*. at 117-18.
[28] *Id*. at 118, 119.
[29] *Id*. at 119.
[30] *Id*. at 119-123
[31] *Id*. at 123-24.
[32] *Id*. at 124-25.

Trial Court Opinion, filed 1/10/17, at 2-5. Following a four-day trial that commenced on March 1, 2016, a jury convicted Appellant of the aforementioned charges, and the trial court sentenced him on May 31, 2016.

On June 30, 2016, Appellant filed both a post-sentence motion which the trial court denied and a timely notice of Appeal. The trial court and the parties have complied with Pa.R.A.P. 1925, and the matter is now ripe for consideration on appeal.

In his brief, Appellant presents the following Statement of Questions Involved.

> (1) Did the [t]rial [c]ourt err as a matter of law by affirming the jury's finding that the Commonwealth presented sufficient evidence of [] Appellant's proximity to the victim beyond mere presence?
>
> (2)(3)(4) Did the [t]rial [c]ourt err as a matter of law and as an abuse of discretion by allowing fabricated and inconsistent testimony of Ms. Mariah Walton in violation of the Joint Defense Agreement and allowing Mr. Jamar Holmes to testify in violation of the sequestration Order where the verdict was against the weight and sufficiency of the evidence and the Commonwealth failed to present sufficient evidence for the jury to find [Appellant] guilty of the crimes charged?
>
> (5) Did the [t]rial [c]ourt err as a matter of law and as an abuse of discretion in introducing as evidence Jury items 8-15 in the Commonwealth[']s Memorandum of law filed 10/29/2015 and ruled on by Order 01/26/2016 because they were calculated and improperly appealed to the sympathy and prejudice of the jury?
>
> (6) Did the [t]rial [c]ourt err as a matter of law and as an abuse of discretion in denying [Appellant's] Omnibus Pretrial motion as it relates to identification evidence pursuant to the Order dated 01/21/2016?

Brief for Appellant at 5. We shall discuss each of these issues in turn, and in first analyzing Appellant's challenge to the sufficiency of the evidence, we employ a well-settled standard of review:

> The standard we apply in reviewing the sufficiency of the evidence is whether viewing all the evidence admitted at trial in the light most favorable to the verdict winner, there is sufficient evidence to enable the fact-finder to find every element of the crime beyond a reasonable doubt. In applying the above test, we may not weigh the evidence and substitute our judgment for the fact-finder. In addition, we note that the facts and circumstances established by the Commonwealth need not preclude every possibility of innocence. Any doubts regarding a defendant's guilt may be resolved by the fact-finder unless the evidence is so weak and inconclusive that as a matter of law no probability of fact may be drawn from the combined circumstances. The Commonwealth may sustain its burden of proving every element of the crime beyond a reasonable doubt by means of wholly circumstantial evidence. Moreover, in applying the above test, the entire record must be evaluated and all evidence actually received must be considered. Finally, the finder of fact while passing upon the credibility of witnesses and the weight of the evidence produced, is free to believe all, part or none of the evidence.
>
> *Commonwealth v. Estepp*, 17 A.3d 939, 943–44 (Pa.Super. 2011) (citing *Commonwealth v. Brooks*, 7 A.3d 852, 856–57 (Pa.Super. 2010)). "This standard is equally applicable to cases where the evidence is circumstantial rather than direct so long as the combination of the evidence links the accused to the crime beyond a reasonable doubt." (*Commonwealth v. Sanders*, 426 Pa.Super. 362, 627 A.2d 183, 185 (1993)). "Although a conviction must be based on 'more than mere suspicion or conjecture, the Commonwealth need not establish guilt to a mathematical certainty.'" *Commonwealth v. Gainer*, 7 A.3d 291, 292 (Pa.Super. 2010) (quoting *Commonwealth v. Badman*, 398 Pa.Super. 315, 580 A.2d 1367, 1372 (1990)).

*Commonwealth v. Antidormi*, 84 A.3d 736, 756 (Pa.Super. 2014), *appeal denied*, 626 Pa. 681, 95 A.3d 275 (Table).

While Appellant couches his initial challenge as one pertaining to the sufficiency of the evidence to sustain his convictions, a reading of his appellate brief reveals that he does nothing more than dispute the credibility of the testimony presented by Ms. Walton in support of his claim. For instance, Appellant stresses that less than two weeks prior to the commencement of his jury trial, on February 18, 2016, Ms. Walton entered a guilty plea for her involvement in Mr. Bradley's death. Appellant states that at trial, "Ms. Walton testified and attempted to corroborate a great deal of evidence proffered by the Commonwealth but did so untruthfully, inconsistently, and deliberately. Specifically, Appellant contends the information concerning his involvement and his proximity to the murder was inaccurate." Brief for Appellant at 10.

Appellant also points out that Ms. Walton admitted on cross-examination to having lied to police three times and indicated that she expected leniency as a result of having entered a guilty plea. *Id*. at 10-11 citing N.T. 3/1/16, at 147-48; 3/2/16, at 13-14. As such, Appellant has presented a challenge to the weight of the evidence, not its sufficiency. *See*, *e.g.*, *Commonwealth v. Gibbs*, 981 A.2d 274, 281–82 (Pa.Super. 2008) (an argument that the fact-finder should have credited one witness's testimony over that of another witness goes to the weight of the evidence,

not the sufficiency of the evidence); ***Commonwealth v. Wilson***, 825 A.2d 710, 713–14 (Pa.Super. 2003) (a review of the sufficiency of the evidence does not include a credibility assessment; such a claim goes to the weight of the evidence); ***Commonwealth v. Gaskins***, 692 A.2d 224, 227 (Pa.Super. 1997) (the fact-finder makes credibility determinations, and challenges to those determinations go to the weight of the evidence, not the sufficiency of the evidence).

The argument portion of Appellant's brief otherwise fails to mention, let alone discuss, any of the elements of the various offenses of which Appellant had been convicted for which the evidence was insufficient to sustain the conviction. Because Appellant has failed to provide any discussion of the sufficiency of the evidence with citation to proper legal authority, we find this issue to be waived. ***See Commonwealth v. Johnson***, 604 Pa. 176, 191-92, 985 A.2d 915, 924 (2009) (finding claims waived where an appellant fails to provide any discussion pertaining to it with citation to relevant authority or fails to develop the issue in any other meaningful fashion capable of review in his appellate brief).

Appellant next contends the jury's verdict was against the weight of the evidence. Specifically, Appellant asserts the Commonwealth's evidence "was so meddled and inconsistent, that a new trial must be awarded." Brief for Appellant at 12. Appellant further maintains that the "inconsistent timing of gunshots, the time period in finding the body and Appellant's whereabouts

before the alleged murder, were insufficient for a jury to return a verdict against [ ] Appellant without shocking ones [sic] sense of conscience." *Id*. at 12. Appellant also generally discusses what he presents as inconsistencies in the testimony of officers and lay witnesses pertaining to the timeframe in which the crimes occurred and the trial court's error in permitting the testimony of Ms. Walton and Mr. Jamal Holmes. *Id*. at 12-14. Specifically, Appellant argues that despite the fact that Ms. Walton's lack of credibility "was fully explored" before the jury, it "shockingly" managed to return a guilty verdict. In addition, Appellant posits the matter should be remanded for a "curative instruction" in light of Mr. Holmes' testimony that while he and Appellant were being transported to the courthouse together, Appellant had offered Mr. Holmes four thousand dollars to change his testimony. *Id*. at 14.

In considering a claim that the verdict was against the weight of the evidence, an appellate court will not substitute its judgment for that of the factfinder, which is free to assess the credibility of witnesses and to believe all, part, or none of the evidence presented. *Commonwealth v. DeJesus*, 580 Pa. 303, 860 A.2d 102 (2004). This Court has held that:

> "[w]hen the challenge to the weight of the evidence is predicated on the credibility of trial testimony, our review of the trial court's decision is extremely limited. Generally, unless the evidence is so unreliable and/or contradictory as to make any verdict based thereon pure conjecture, these types of claims are not cognizable on appellate review." *Commonwealth v. Rossetti*, 863 A.2d 1185, 1191 (Pa. Super. 2004) (citation omitted). "Moreover, where the trial court has ruled on the weight claim

- 8 -

below, an appellate court's role is not to consider the underlying question of whether the verdict is against the weight of the evidence." **Commonwealth v. Champney**, 574 Pa. 435, 832 A.2d 403, 408 (2003). "Rather, appellate review is limited to whether the trial court palpably abused its discretion in ruling on the weight claim." **Id.**

**Commonwealth v. Trippett**, 932 A.2d 188, 198 (Pa.Super. 2007). In addition, this Court will not reverse a verdict unless it is so contrary to the evidence as to shock one's sense of justice. **Commonwealth v. Giordano**, 121 A.3d 998, 1007 (Pa.Super. 2015).

As a preliminary matter, we note that, generally, a challenge to the weight of the evidence must be preserved by a motion for a new trial. Pa.R.Crim.P. 607. The Rule provides:

> **Rule 607. Challenges to the Weight of the Evidence**
> (A) A claim that the verdict was against the weight of the evidence shall be raised with the trial judge in a motion for a new trial:
> (1) orally, on the record, at any time before sentencing;
> (2) by written motion at any time before sentencing; or
> (3) in a post-sentence motion.

Pa.R.Crim.P. 607(A)(1)–(3). "As noted in the comment to Rule 607, '[t]he purpose of this rule is to make it clear that a challenge to the weight of the evidence must be raised with the trial judge or it will be waived.'" **Commonwealth v. Gillard**, 850 A.2d 1273, 1277 (Pa.Super. 2004), *appeal denied*, 581 Pa. 672, 863 A.2d 1143 (2004). An appellant's failure to avail himself of any of the prescribed methods for presenting a weight of the evidence issue to the trial court constitutes waiver of that claim, even if the

trial court responds to the claim in its Rule 1925(a) Opinion. ***Commonwealth v. Burkett***, 830 A.2d 1034, 1037 n. 3 (Pa.Super. 2003).

Herein, Appellant preserved a challenge to the weight of the evidence in his post-sentence motion filed on June 30, 2016. Notwithstanding, as he did in setting forth his initial claim, Appellant conflates challenges to the sufficiency and weight of the evidence in attempting to develop an argument in support of his weight claim in his appellate brief. This is evident in Appellant's concluding sentence pertaining to that portion of the argument wherein Appellant states: "[v]iewing evidence in light most favorable to the Commonwealth, Counsel respectfully requests a cursory review of the jury verdict and that the case be remanded for a new trial." Brief for Appellant at 14. As noted above, this standard of review is employed in an analysis of a sufficiency of the evidence claim. In addition, the majority of Appellant's argument is comprised of conclusory statements and bald allegations unsupported by citations to proper legal authority. As such, Appellant's weight claim is arguably waived for lack of proper development. ***See Johnson***, ***supra***.

To the extent we may view Appellant's purported argument as properly challenging the weight of the evidence to sustain his convictions, upon our review of the record evidence and trial transcripts, we find this claim merits no relief. The trial court declined to upset the verdict of the jury, generally noting that:

When [A]ppellant raised this issue in his post-sentence motion, the undersigned considered all evidence of record and found no factual basis for concluding that the jury's verdict was contrary to the evidence. The evidence produced by the prosecutors in this case was not unusual compared to that which is produced in typical murder and conspiracy trials, in that some was inconsistent, some circumstantial, and some came from corrupt, biased and polluted sources. In the typical case, such circumstances do not render the jury's verdict against the weight of the evidence because "the trier of fact, while passing upon the credibility of witnesses and the weight of the evidence to be afforded the evidence produced is free to believe all, part or none of the evidence." *Commonwealth v. Grisavage*, 517 A.2d 1256, 1257 (Pa. 1986).

Trial Court Opinion, filed 1/10/17, at 9.

Specifically, the trial court reasoned it had not erred in allowing Ms. Walton to testify, as the evidence adduced at a hearing held on February 29, 2016, did not directly or inferentially support a conclusion that either Ms. Walton or her counsel had exploited the joint defense agreement to Appellant's prejudice. Trial Court Opinion, filed 1/10/17 at 10-11. The trial court also found no record evidence indicated Ms. Walton or her counsel ever provided detectives with information they had learned from Appellant or his counsel, and Ms. Walton was questioned regarding only her first-hand knowledge of the facts relevant to proving the elements of the crimes of which Appellant had been charged. The trial court further noted Appellant's counsel subjected Ms. Walton's counsel to a rigorous cross-examination regarding changes in Ms. Walton's memory of the murder weapon. *Id*. at 12-14.

Indeed, at the hearing, Ms. Walton's counsel explained, *inter alia*, that he and Ms. Walton never met with or discussed any trial strategies such as potential defenses or any affirmative defenses like self-defense with Appellant, nor did Ms. Walton's counsel share any information with the Commonwealth that he had learned from Appellant's counsel as a result of a joint defense agreement. N.T., 2/29/16, at 19-20. Counsel related that on only one occasion he had been with Appellant's counsel for approximately two hours at which time they and their respective investigators photographed the alleged crime scene and discussed the timeline in question. Counsel also discussed generally potential witnesses, those individuals' previous statements, and any possible motivation any might have for testifying falsely. *Id*. at 22-26. However, once Ms. Walton advised her counsel that she wished to cooperate with the prosecution in exchange for a negotiated guilty plea, neither she nor counsel divulged any defense strategies, witness issues, or other contents of their discussions to the Commonwealth; counsel had been present at every meeting between Ms. Walton and the Commonwealth. *Id*. at 28-36.

In addition, the trial court explained its decision to permit the testimony of Jamar Holmes regarding his knowledge of the crimes and Appellant's alleged attempt to bribe him as follows:

> Jamar Holmes, a cousin of Troy Holmes, testified as a witness for the prosecution on the third day of the trial, March 3, 2016. In order to avoid confusion between the two witnesses in this discussion, the undersigned will refer to Jamar Holmes as

"Jamar." On direct examination, Jamar first testified about events that transpired only minutes before the murder: he had been at Troy Holmes' home with Bradley; he had left the premises while Bradley was still there; as he walked down the block he saw [A]ppellant, who[m] he knew; and the two made eye contact as they walked past each other.[84] He then testified as to the events that transpired on the day before, March 2, 2016. He stated that after sheriffs' deputies placed him on a bus to take him from the county prison to the courthouse, [A]ppellant sat next to him and offered to pay him $4,000.00 if he would change his anticipated testimony.[85]

Jamar further testified, under oath on direct examination, that [A]ppellant told him that Ms. Walton had driven him to Troy Holmes's home, where he waited for Bradley to come outside, and when he came out, [A]ppellant killed him.[86] If Jamar's account of walking past [A]ppellant on the street shortly before the murder had been true, then the account [A]ppellant had supposedly told him on the bus would have been inconsistent with what he saw and knew to be true. Moreover, because Jamar testified that he and [A]ppellant had made eye contact, [A]ppellant would have known that Jamar knew, or would have known, that the account [A]ppellant had supposedly told him on the bus was false. Appellant's lawyer extensively and ably exploited this problem with Jamar's testimony when cross-examining him to give the jury a reason to believe (in addition to the witness's convictions of multiple *crimen falsi* and his pending sentencing hearing on another crime) that he had lied --not only in his testimony about the night of the murder, but about [A]ppellant trying to bribe him to change his testimony.[87]

Appellant, his lawyer, the prosecutors or the undersigned knew in advance that Jamar would testify that [A]ppellant offered him a bribe. At the end of the first day of trial, the undersigned learned that the sheriff's deputies who were in charge of transportation of [A]ppellant and several of the trial witnesses from the county prison to the courthouse had placed [A]ppellant and those witnesses on the same bus.[88] In response, the undersigned expressly told the deputies in the courtroom to tell the deputies in charge of transportation not to put [A]ppellant and the witnesses in the same vehicle.[89] Nonetheless, to the great displeasure of the undersigned and counsel, on the next day the deputies in charge of transportation placed [A]ppellant and Jamar side-by-side on the same bus.[90] Jamar told the detectives that while on the bus [A]ppellant had made an incriminating statement and offered to pay him

- 13 -

$4,000.00 if he would change his testimony.[91] The detectives took a sworn statement from Jamar regarding [A]ppellant's statement and gave a copy to [A]ppellant's trial lawyer.[92]

In view of the unexpected turn of events, the undersigned postponed the testimony of Jamar from that day until the next, and gave [A]ppellant's lawyer and private investigator an opportunity to interview other prison inmates in order to obtain, if possible, evidence in opposition to Jamar's anticipated testimony regarding the incriminating statement made by [A]ppellant.[93] With the assistance of the sheriff and prosecutors, [A]ppellant's investigator ascertained the identities of the other inmates on the bus, interviewed them at the prison that evening, transcribed the notes of those interviews, and gave the notes to [A]ppellant's trial lawyer the next morning." The postponement of the testimony of Jamar, together with the notes of the interviews, were what enabled [A]ppellant's trial lawyer to thoroughly cross-examine the witness and exploit the problems with his testimony, as previously described. Appellant now claims that he was prejudiced because he lacked sufficient opportunity to challenge the veracity of that testimony and to interview others who may have been present and had personal knowledge of whether appellant spoke to Jamar, and if so, what he said. The record contradicts that claim.

At a hearing the next morning (outside the presence of the jury) [A]ppellant's lawyer argued that his client had been severely prejudiced by the failure of the sheriff's deputies to follow the court order to transport [A]ppellant apart from the witnesses and asked that the undersigned preclude Jamar from testifying about the statements appellant made on the bus.[95] Appellant's lawyer moved for a mistrial,[96] arguing that: the court's transportation order to the sheriff's deputies was equivalent or analogous to a sequestration order; the deputies had breached their obligation to follow the order; the breach caused [A]ppellant to sustain severe prejudice; and the appropriate remedy would be to preclude the Commonwealth from presenting evidence of the [A]ppellant's statement or to declare a mistrial.[97] Based upon the information available at the time, [A]ppellant's lawyer conceded that the prosecutors did not breach any legal obligation,[98] and based upon the same information the undersigned agreed. The undersigned denied relief and stated the reasons on the record.[99]

The events that have unfolded since that time further support that decision. Having heard Jamar testify at trial and watched his demeanor, the undersigned finds his claim that

[A]ppellant offered to pay him to change his anticipated testimony to be credible. Appellant, through counsel, produced no evidence that Jamar, the deputies or the prosecutors offered him any incentive to speak to Jamar, or gave him any disincentive to remain silent and no such evidence has emerged since. Regardless of whether the transportation order is a sequestration order or is analogous to one, and regardless of whether Jamar initiated conversation with [A]ppellant, it was [A]ppellant who made the decision to speak to Jamar. His decision was not caused by coercion or deceit, but was purely voluntary. Any prejudice he sustained was caused by himself, and therefore he was not entitled to an order prohibiting the Commonwealth from producing evidence of his statement or declaring a mistrial.

---

[84] N.T. March 3, 2016, pp. 63-66.
[85] *Id*. at 67-70.
[86] *Id*. at 68.
[87] 70-81, 88-90. The jury was free to resolve this problem, as it apparently did, by concluding that [A]ppellant failed to realize, or did not care, that he was telling Jamar Holmes something Jamar must have known not to be true.
[88] N.T. March 1, 2016, pp. 182-83.
[89] *Id*. at 183-84.
[90] N.T. March 2, 2016, pp. 248-50, 334-42.
[91] *Id*.
[92] *Id*.
[93] *Id*. at 336-39.
[94] N.T. March 3, 2016, pp. 2-3.
[95] N.T. March 3, 2016, pp. 2-15.
[96] *Id*. at 56-57.
[97] *Id*. at 6-15, 56-58.
[98] *Id*. at 12-13.
[99] *Id*. at 51-59.

Trial Court Opinion, filed 1/10/17, at 20-23.

Upon our review of the record and in light of the foregoing, we discern no abuse of discretion in the trial court's rejection of Appellant's weight claim.[2]

Appellant next avers the trial court abused its discretion in allowing "items 9-13 identified in the Commonwealth's 10/29/2015, 'Memorandum in Support of Motions to Admit Other Bad Acts' by way of Judicial Order on 01/26/2016 was unduly prejudicial" and concludes that "they were

_____

[2] To the extent Appellant asks this Court to remand the matter for a "curative instruction," a review of the record reveals Appellant did not object to or request a curative instruction following Mr. Jamal's testimony at the time of trial. N.T., 3/3/16, at 67-70, 90; N.T., 3/4/16, at 2-75. "Issues not raised in the [trial] court are waived and cannot be raised for the first time on appeal." Pa.R.A.P. 302(a). In addition, "it is axiomatic that issues are preserved when objections are made timely to the error or offense." *Commonwealth v. Baumhammers*, 599 Pa. 1, 24, 57, 960 A.2d 59, 73 (2008). "The purpose of contemporaneous objection requirements respecting trial-related issues is to allow the court to take corrective measures and, thereby, to conserve limited judicial resources." *Commonwealth v. Sanchez*, 614 Pa. 1, 31, 36 A.3d 24, 42 (2011). "[A] party may not remain silent and afterwards complain of matters which, if erroneous, the court would have corrected." *Commonwealth v. Strunk*, 953 A.2d 577, 579 (Pa.Super. 2008). Therefore, Appellant has waived this request for failure to make a timely and specific objection on the record. *See Commonwealth v. Wholaver*, 605 Pa. 325, 340, 989 A.2d 883, 892 (2010) (where trial counsel objected to the admission of evidence but did not request a limiting instruction, the issue of trial court error for not giving such instruction is waived); *Commonwealth v. Bryant*, 579 Pa. 119, 141, 855 A.2d 726, 739 (2004) (failure to request cautionary instruction upon introduction of evidence constitutes waiver of claim of trial court error in failing to issue cautionary instruction); *Commonwealth v. Bell*, 562 A.2d 849, 853 (Pa.Super.1989) ("Where counsel fails to request a mistrial when the alleged prejudicial event occurs, the issue is not preserved for appellate review.").

calculated and did appeal improperly to the sympathy and prejudice of the jury." Brief for Appellant at 14. Our standard of review of Appellant's claims regarding the admissibility of evidence is well-settled:

> The admission of evidence is solely within the discretion of the trial court, and a trial court's evidentiary rulings will be reversed on appeal only upon an abuse of that discretion. An abuse of discretion will not be found based on a mere error of judgment, but rather occurs where the court has reached a conclusion that overrides or misapplies the law, or where the judgment exercised is manifestly unreasonable, or the result of partiality, prejudice, bias or ill-will.

***Commonwealth v. Witmayer***, 144 A.3d 939, 949 (Pa.Super. 2016) (citation omitted).

Despite requesting that this Court make "a cursory review of items 9-13" and subsequently remand for a new trial, Appellant's only specific reference to "items 9-13" is the following sentence:

> As it relates to Ms. Esther Saunders and Mr. Herbierto Delmor[a]l, Appellant contends their individual statements were offered on an improper basis that causally diverted, the jury's attention away from its duty of weighing the evidence impartially. Because the jury focused on [A]ppellant's past acts, they were unable [to] weigh evidence impartially, resulting in the allowance of unduly prejudicial evidence. (quotation marks and citation omitted).

Brief for Appellant at 15.[3]

---

[3] Ms. Saunders knew Appellant and Mr. Bradley and testified Appellant had accused Mr. Bradley of stealing money obtained from the sale of drugs and that he had threatened Mr. Bradley. N.T., 3/2/16, at 197-98. Mr. Bradley instructed Ms. Saunders as to the type of funeral he wanted should he die and provided her with various names and phone numbers which he jotted down in her presence. ***Id***. at 200-02. Mr. Delmoral admitted he had
*(Footnote Continued Next Page)*

Appellant utterly failed to develop how the probative value of these vaguely referenced statements was outweighed by the potential for unfair prejudice under the Pennsylvania Rules of Evidence or to illustrate how he reached his bald conclusion that "[b]ecause the jury focused on [A]ppellant's past acts, they were unable [to] weigh evidence impartially, resulting in the allowance of unduly prejudicial evidence." Brief for Appellant at 15. Thus, we find this issue waived for lack of development. *See Johnson*, *supra*.

_____
*(Footnote Continued)*

purchased heroin and cocaine from Mr. Bradley and that he had stolen drugs from him as well. Mr. Delmoral stated Appellant pursued and beat him to retaliate. *Id*. at 119-24. He also had purchased drugs from Ms. Walton and saw her counting money. *Id*. at 127-28.

Pennsylvania Rule of Evidence 404(b) entitled **Crimes, Wrongs or Other Acts**, provides in relevant part that:

> *(1) Prohibited Uses.* Evidence of a crime, wrong, or other act is not admissible to prove a person's character in order to show that on a particular occasion the person acted in accordance with the character.
> *(2) Permitted Uses.* This evidence may be admissible for another purpose, such as proving motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake, or lack of accident. In a criminal case this evidence is admissible only if the probative value of the evidence outweighs its potential for unfair prejudice.

Pa.R.E. 404(b). The trial court determined the foregoing evidence was admissible at trial to show the course of events that led to the crimes with which Appellant had been charged. Specifically, the trial court found the evidence probative of Appellant's motive to shoot Mr. Bradley and circumstantial evidence of his specific intent to act in concert with Ms. Walton and to kill Mr. Bradley. Trial Court Opinion, filed 1/10/17, at 25-27.

Finally, Appellant challenges the in-court identification of him by Mr. Steven Corey and Ms. Mary Ellen Gibson. In doing so, Appellant avers the trial court erred in failing to suppress an out-of-court photo array prior to trial because the identification procedure had been unduly suggestive and, therefore, illegal. Appellant asserts "the pictures included in the photo array were inconsistent. Although all eight photographs depicted all black males, the photographs were inconsistent in that they were photographs of males of varying age, some had facial hair while others did not, some were bald while others were not and the skin tones were varying." Brief for Appellant at 16. Appellant concludes that "[p]resuming that the photo array identification procedure was illegal and therefore inadmissible, Appellant's in-court identification by Mr. Steven Corey and Ms. Mary Ellen Gibson requires review." *Id*.

Our standard of review of this issue is as follows:

> When reviewing the propriety of a suppression order, an appellate court is required to determine whether the record supports the suppression court's factual findings and whether the inferences and legal conclusions drawn by the suppression court from those findings are appropriate. Where the record supports the factual findings of the suppression court, we are bound by those facts and may reverse only if the legal conclusions drawn therefrom are in error. However, where the appeal of the determination of the suppression court turns on allegations of legal error, the suppression court's conclusions of law are not binding on an appellate court, whose duty it is to determine if the suppression court properly applied the law to the facts.
> Whether an out of court identification is to be suppressed as unreliable, and therefore violative of due process, is determined from the totality of the circumstances.

Suggestiveness in the identification process is a factor to be considered in determining the admissibility of such evidence, but suggestiveness alone does not warrant exclusion. Identification evidence will not be suppressed unless the facts demonstrate that the identification procedure was so impermissibly suggestive as to give rise to a very substantial likelihood of irreparable misidentification. Photographs used in line-ups are not unduly suggestive if the suspect's picture does not stand out more than the others, and the people depicted all exhibit similar facial characteristics. *Commonwealth v. Fulmore*, 25 A.3d 340, 346 (Pa.Super. 2011) (internal citations and quotation marks omitted). Moreover, our scope of review from a suppression ruling is limited to the evidentiary record that was created at the suppression hearing. *In re L.J.,* 622 Pa. 126, 148, 79 A.3d 1073, 1086 (2013).

*Commonwealth v. Stiles*, 143 A.3d 968, 978 (Pa.Super 2016), *appeal denied Commonwealth v. Stiles*, 2016 WL 7106404 (Pa. Dec. 6, 2016) (Table).

Although Appellant asserts the photographic array was unduly suggestive, he failed to ensure that the certified record contained a copy of the photo array in question, despite the fact that our analysis of this issue requires a review of it; therefore, he has waived a challenge to the trial court's denial of his motion to suppress the same. *See Commonwealth v. Martz*, 926 A.2d 514, 525 (Pa.Super. 2007), *appeal denied,* 596 Pa. 704, 940 A.2d 363, (2008) (finding issue challenging suppression of photo array waived where appellant failed to ensure the original record certified for appeal contained sufficient information to conduct a proper review). *See also Stiles*, *supra*.

Appellant's remaining challenge to the in-court identification of Appellant by Mr. Corey and Ms. Gibson is based upon each witness's alleged "limited exposure" to Appellant outside of the courtroom and the "significant" period of time which lapsed between the murder and the commencement of trial, the fact that neither witnessed the "crime," and that Appellant was the only individual seated next to defense counsel at trial. Brief for Appellant at 16-17.

To the contrary, Mr. Corey testified he worked as a maintenance man and lived in the same apartment building as Appellant whom he knew as "B." N.T., 3/2/16, at 163-64. Mr. Corey also indicated he was in Appellant's room when he saw Appellant in possession of a .380 caliber handgun.[4] *Id*. at 165-67. Additionally, Ms. Gibson identified Appellant in the courtroom. She explained she knew Appellant as "Bub," through her acquaintance with Ms. Walton and had been in the company of Ms. Walton, Appellant and Mr. Bradley on the night of the murder. N.T., 3/2/15, at 234-41.

Appellant did not object to either witness's identification of Appellant at trial. In addition, aside from bald allegations to the contrary, Appellant has failed to show that these in-court identifications were somehow suggestive. **See Commonwealth v. Wade**, 33 A.3d 108, 114 (Pa.Super. 2011) (stating a witness's in-court identification may be admissible despite

---

[4] The murder weapon was a .380 caliber handgun.

the inadmissibility of a pre-trial identification where the in-court identification is not tainted by the previous identification). Thus, Appellant's final issue fails.

Judgment of sentence affirmed.[5]

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 6/28/2017

---

[5] In its Rule 1925(a) Opinion, the trial court found no merit to any of Appellant's claims. However, "[t]his Court is not bound by the rationale of the trial court, and we may affirm the trial court on any basis." *Commonwealth v. Williams*, 73 A.3d 609, 617 (Pa.Super. 2013).